UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M-11-306**

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JOSEPH CATAPANO and
MICHAEL PIERVINANZI,

        Defendants.

- - - - - - - - - - - - - - - -X

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANTS

(T. 18, U.S.C., § 1349(a))

EASTERN DISTRICT OF NEW YORK, SS:

       Michael G. McSwain, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

       Upon information and belief, on or about and between February 4, 2011 and March 24, 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JOSEPH CATAPANO and MICHAEL PIERVINANZI, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property in connection with purchases and sales of Euro Solar Parks, Inc. common stock, contrary to Title 18, United States Code, Section 1348.

       (Title 18, United States Code, Sections 1349)

       The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the FBI since January 2007. Since March 2009, I have been assigned to the FBI squad that investigates corporate and securities fraud crimes. During my tenure with the FBI, I have participated in numerous investigations over the course of which I have conducted physical surveillance, executed search warrants, supervised the activities of cooperating witnesses, and reviewed recorded conversations.

2. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation; (b) reports made to me by other law enforcement authorities; and (c) discussions with other law enforcement agents involved in this investigation.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the arrest of the above-specified defendants, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts which I believe are necessary to establish probable cause for the arrest warrants sought herein.

## OVERVIEW

4. Euro Solar Parks, Inc. ("ESLP") is a business that purports to develop, build and operate commercial solar power plants with a focus on the emerging European solar energy market. Beginning in or about April 2010, ESLP was a publicly-traded corporation based in Nevada, and its shares traded under the ticker "ESLP" on the Over The Counter Bulletin Board (OTCBB). ESLP was required to filed reports under section 15(d) of the Securities Exchange Act of 1934.

5. As described in further detail below, there is probable cause to believe that the defendants JOSEPH CATAPANO and MICHAEL PIERVINANZI engaged in a scheme to deprive the purported purchasers of ESLP stock of their right to their brokers' honest services by concealing exorbitant commissions to the brokers. Specifically, as described below, there is probable cause that the defendants JOSEPH CATAPANO and MICHAEL PIERVINANZI entered into a scheme in which they agreed to pay a 30% undisclosed commission to an undercover government agent purporting to be a middle man or stock broker (the "UC") if the UC purportedly arranged for other brokers (the "Purported Brokers"), who purportedly had a fiduciary duty to their clients (the "Purported Clients"), to purchase, on behalf of the Purported Clients, three million dollars' worth of ESLP stock over a 60 days period and agreed not to sell the purchased shares for at least a six-month period.

6. As described in further detail below, the conspirators then agreed to and carried out a three-day trial during which approximately $10,000 worth of ESLP stock on three consecutive days was purchased purportedly by the Purported Brokers on behalf of the Purported Clients. After the second day, the defendant JOSEPH CATAPANO provided the UC with the agreed-upon 30% commission, i.e., $8,800.

### THE UC

7. On or about February 4, 2011, the UC engaged in a consensually-recorded meeting with the defendant MICHAEL PIERVINANZI and a third party at a hotel in Manhattan (the "Manhattan Hotel") to discuss a potential stock deal. At the outset of the recorded meeting, the third party introduced the UC to the defendant MICHAEL PIERVINANZI and advised that his "partner," i.e., the defendant JOSEPH CATAPANO, was available by telephone.[1/] The UC subsequently advised that he had "private broker clients" (i.e., the Purported Brokers) who administered discretionary accounts for their clients (i.e., the Purported Clients) and who would purchase a significant number of shares from the defendants and would then "put the stock away." In response, the defendant MICHAEL PIERVINANZI stated during the consensually-recorded meeting:

> PIERVINANZI: Listen, [the third party] told you about what the commission is?

---

[1/] The excerpts of recorded conversations included herein are based on draft transcripts of those conversations, which are subject to revision.

5

| | |
|---|---|
| UC: | 30? |
| PIERVINANZI: | 30, right. . . . |
| UC: | 30, that's a friendship situation. |
| PIERVINANZI: | If they're interested in private placement, it could be higher. |
| PIERVINANZI: | Go up to 40. [the third party] knows how these guys pay. We have an offshore account in South Africa. We get the checks sent there. All the money goes there. The check comes wired back in. We cash them at our check cashing place for six points. No questions asked, nothing. |

The UC subsequently spoke to the defendant JOSEPH CATAPANO to further negotiate the details of the scheme and arranged for the defendant JOSEPH CATAPANO to send the UC an email including the defendant JOSEPH CATAPANO's telephone number.[2/]

      8.    Based on my training, experience and knowledge of the investigation, including information provided by the UC, I know that there are two general types of investments accounts: non-discretionary and discretionary. A non-discretionary account requires the broker to obtain authorization before it makes any investment decisions. A discretionary account allows an investment broker to make account transactions without the client's prior approval.

---

     [2/]    Only the UC's portion of the telephone conversation was consensually recorded.

6

9. On or about February 9, 2011, the UC placed a consensually-recorded telephone call to the defendant JOSEPH CATAPANO. A review of the recorded telephone call reveals that the UC and the defendant JOSEPH CATAPANO arranged to meet at the Manhattan Hotel on February 9, 2011 at 1:00 p.m. During the recorded telephone call, the defendant JOSEPH CATAPANO also indicated that "Mikey" was in the presence of the defendant JOSEPH CATAPANO and that he knew the location of agreed-upon meeting location. Based on my knowledge of this investigation, I believe "Mikey" is the defendant MICHAEL PIERVINANZI.

10. On or about February 9, 2011, the UC, who was equipped with a recording device, met with the defendants JOSEPH CATAPANO and MICHAEL PIERVINANZI at the Manhattan Hotel. Following the meeting, the UC advised that during the meeting, the defendants JOSEPH CATAPANO and MICHAEL PIERVINANZI had agreed that the Purported Brokers would purchase, as "test transactions," on behalf of the Purported Clients, approximately $30,000 worth of ESLP stock from the defendant JOSEPH CATAPANO over the course of three days in exchange for a 30% commission.

11. On Friday, February 11, 2011, the UC placed a consensually-recorded telephone call to the defendant JOSEPH CATAPANO. A review of the recorded telephone call reveals that CATAPANO told the UC that he was ready with ESLP whenever the UC was ready to go. The UC confirmed that his "guys" (i.e., the Purported Brokers) were interested and clarified their plan to purchase "three million over a 60 day period of time." The

defendant JOSEPH CATAPANO answered, "perfect," and then said, "We'll do Wednesday, Thursday, Friday. We'll do 10 a day. I'll show you how I work. I'll get you taken care of right away and then we'll move on to bigger and better things."

12. Based on my knowledge of the investigation, including information provided by the UC, I believe the reference by the defendant JOSEPH CATAPANO to "Wednesday, Thursday, Friday . . . 10 a day" reflected the plan to purchase $10,000 of ESLP stock on each Wednesday, February 16, 2011; Thursday, February 17, 2011; and Friday, February 18, 2011. I further believe the UC's reference to 3 million over a 60 day period referred to the plan to purchase $3,000,000 of ESLP stock over the course of 60 days following the successful completion of the agreed-upon three days of test transactions.

13. On or about Wednesday, February 16, 2011, at approximately 11:08 a.m., the UC placed a telephone call to the defendant JOSEPH CATAPANO, which call was consensually recorded. During the recorded call, the following discussion occurred:

    CATAPANO: Hey [the UC's name], how are you?

    CATAPANO: It's 45,000 at a limit of 22.
              That's 9,900.

    UC:       Let me call my broker and make sure
              he's good to go. Just wanted to
              make sure you're ready.

    CATAPANO: I'm ready. I'll take whatever
              you've got.

14. Based on my training, experience and knowledge of the investigation, including information provided by the UC, I

believe that the defendant JOSEPH CATAPANO's reference to "45,000 at a limit of 22" referred to the plan for the Purported Brokers to make a bid to purchase 45,000 shares of ESLP at a maximum of 22 cents per share, which amounts to approximate $9,900 worth of ESLP stock.

15. On or about Wednesday, February 16, 2011, at approximately 11:18 a.m., the UC placed a telephone call to the defendant JOSEPH CATAPANO, which call was consensually recorded. During the recorded call, the following discussion occurred:

> UC: I'm good to go on my end. Just one last thing I wanted to confirm before we do the trade here.
>
> UC: We'll do three separate wires. We'll do T + 4, if that's what you want, right?
>
> CATAPANO: Right.
>
> UC: Once that position settles up, you'll shoot me a copy of the DTCs and then we'll go forward.
>
> CATAPANO: So 45,000 pieces. Limit 22.
>
> UC: We'll hang up the phone and then I'll call my broker. Volume it's me.

CATAPANO then stated that he would call the UC right back as soon as the purchase had been made. Based on my training, experience and knowledge of the investigation, including information provided by the UC, I believe "T+4" refers to the day of the trade plus four days, or four days after the trade date, and that the UC would receive the commission four days after the date of the trade. I further believe that the UC's request for a "copy

of the DTCs," a reference to the "Depository Trust & Clearing Corporation," pertained to the mechanism that would allow the UC to buy and sell ESLP shares electronically (i.e., eliminating the requirement that the buyer and seller exchange a physical stock certificate).

16. Immediately thereafter, the UC purchased 45,000 shares of ESLP at a price of $0.22 per share. On February 17, 2011, the defendant JOSEPH CATAPANO advised the UC to purchase 45,000 shares of ESLP at $0.235 per share. On February 18, 2011, the defendant JOSEPH CATAPANO advised the UC to purchase 50,000 shares of ESLP at a price of $0.262 per share.

17. On or about February 19, 2011, at approximately 7:20 p.m., the UC placed a telephone call to the defendant MICHAEL PIERVINANZI, which telephone call was consensually recorded. During the recorded telephone call, the following discussion occurred:

> UC: I don't think it is gonna be possible. One thing I'm gonna tell you is tell you straight. I'm not going to mislead you.
>
> PIERVINANZI: I respect that.
>
> UC: The brokers are the guys that have the control here right now, with respect to the timing of the buying. I mentioned to Joe [Catapano] when we went. Guys are committed to doing the deal - 3 million.
>
> PIERVINANZI: I know he set aside these funds for next week.

PIERVINANZI: I'll call Joe tomorrow morning and I'll tell him what you said.

UC: Second week in March.

18. On or about March 7, 2011, at approximately 5:25 p.m., the UC placed a telephone call to the defendant JOSEPH CATAPANO, which telephone call was consensually recorded. During the recorded telephone call, the following discussion occurred:

UC: How's your ESLP looking?

CATAPANO: She was 20 offer today, traded about 197,000 shares. I mean, the volume's been there. The price was a little bit shaky, but you know. There was a short from a couple of these fuckin' market makers, but we're straightening out, they're straightening out, little by little.

UC: Good

CATAPANO: I need to get some buy in into the stock. As soon as I get some buy in to the stock, everything will change.

UC: Yeah, that's what I'm here for right?

CATAPANO: I'm hoping so. What's happening man?

UC: Not too much. I just wanted to touch base with you. Give you a little update and figure out where we're at. Um, how are you making out with the DTCs?

CATAPANO: I definitely have them and the new ones should be coming on Friday, but I have the last batch.

UC: Okay

11

CATAPANO: I have those available so whatever you wanna do, just let me know

UC: Great, so you got it DTC listed?

CATAPANO: Yes. Sure.

UC: Good. Excellent. Alright, that's good, that's good.

* * *

CATAPANO: Now as far as us starting work, when you do you see this happening?

UC: Uh, the week of the 14th is what I've been told by my guys so I would anticipate, um, they're a bunch of, a bunch of Irish guys so I'm thinking it's gonna probably be a Friday, the 18th or something, which is, which is that Friday. I'm thinking that's gonna be the kickoff, but I'll find out for sure. They wanted to see the DTCs first and um, you know, we wanted to get that on board and then, uh, we're ready to go. I mean, they're ready to go; they're ready to go. I gave them the figure of 3 mil and um, and um that's what they're clearing their plate to do.

CATAPANO: Okay

UC: The one con-, you know what, one last thing. One concern they did have though is these guys are very careful, very cautious, as am I and what they wanted to make sure of is with the company itself, with Euro Solar, um, you know with the website and whatever else they have for their IR, their PR number to contact.[3/] As I told you, these are

---

[3/]   Based on my training, experience and knowledge of this investigation, including information provided by the UC, I believe that "IR" referred to ESLP's Investor Relations department and that "their PR number" referred to the telephone number for ESLP's Press Relations department.

                discretionary accounts and these customers, they don't even give a shit about their statements because they have so much money, which is a beautiful thing.

CATAPANO: Right.

UC: But um in the event somebody, somebody stumbles into their account and the statement and seeks ESLP there and they decide to call the company to find out more about it.

CATAPANO: They're gonna get a contact.

UC: What's that?

CATAPANO: They're gonna get someone who says hello . . . someone to speak to. Someone who's gonna give them information with pleasure.

UC: Good

CATAPANO: Good information. Like these people they're gonna speak to are gonna give them the right and good information so that when they hang up the phone they're gonna feel comfortable to know what they found on their statement today

UC: Perfect. Perfect.

CATAPANO: Okay, always.

UC: And their main concern is they don't want someone on the other end of the phone. It can't be known that they're getting 23 points on this deal. That's their concern.

CATAPANO: Nobody knows nothing but you.

UC: Good.

CATAPANO: Alright, there's no talk about that stuff, okay? This is between us.

13

> UC: Then we're crystal clear and they'll be comfortable. I'm comfortable. They're comfortable.

Based on my training, experience and knowledge of this investigation, including information provided by the UC, I believe that the UC's reference to "23 points" referred to 23% commission that the Purported Brokers were allegedly going to receive and that the defendant JOSEPH CATAPANO's comment that "nobody knows nothing but you" referred to the defendant JOSEPH CATAPANO's belief that the commission would not be disclosed to anyone else, including the Purported Clients.

19. On or about March 10, 2011, the defendant JOSEPH CATAPANO met with the UC, who was equipped with a recording device, and confirmed that the defendant MICHAEL PIERVINANZI would receive a portion of the proceeds of the scheme relating to the purchase of $3,000,000 of ESLP stock over a 60-day period.

20. On or about March 23, 2011, the UC, who was equipped with a recording device, placed a telephone call to the defendant MICHAEL PIERVINANZI, during which they discussed the scheme between the defendants JOSEPH CATAPANO and MICHAEL PIERVINANZI and the UC. In response to the UC's comment that the Purported Brokers who had a "huge discretionary accounts" on behalf of the Purported Clients who "trust the hell out of these guys," i.e., the Purported Brokers, who wanted to make sure that everything was "tight, tight, tight," the defendant MICHAEL PIERVINANZI confirmed that ESLP was "on board" and that "no one was going to be selling anything under anybody's feet." The

14

defendant MICHAEL PIERVINANZI then confirmed that "nobody," i.e., including the Purported Clients, could "ever know that these brokers [i.e., the Purported Brokers"] are getting 23 points," i.e., a 23 percent commission.

21. Because public filing of this document could result in a risk of flight by the defendants, as well as jeopardize the government's investigation, your deponent respectfully requests that the complaint and arrest warrants be filed under seal.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendants JOSEPH CATAPANO and MICHAEL PIERVINANZI may be dealt with according to law.

Michael G. McSwain
Special Agent, FBI

Sworn to before me this
24th day of March, 2011

ge